# NEW YORK AND NEW HAVEN R. R. CO. *a.* SCHUYLER.

*Supreme Court, First District; Special Term, May,* 1855.

### JOINDER OF PARTIES.—MULTIFARIOUS COMPLAINT.

A bill of interpleader can only be filed when the plaintiff has no claim adverse or hostile to the parties defendant. If the complaint asks for relief specifically against the defendants—further than to require the defendants to interplead with each other—the bill is not one of interpleader, or in the nature of a bill of interpleader.

*It seems,* that a corporation is composed of the aggregate body of individual corporators united under the charter, and is in no sense a trustee for the individual corporators.

Suits heretofore known as *bills of peace* may be brought to avoid multiplicity of suits, and may embrace a large number of defendants. But such suits must relate to matters of the same nature, having a connection with each other, and in which all of the defendants are more or less concerned, though their rights in respect to the general subject of the case may be different.

Such bill must have for its foundation some issue which concerns all of the parties defendant—an issue with which each defendant is connected, so as to give the plaintiff a right to a decree as to each one in respect of first issue and common question.

Where there had been a fraudulent over-issue of the stock of a corporation beyond the amount allowed by its charter by the act of its duly authorized transfer agent, and a part of such stock was held by guilty parties with knowledge of the fraud, and a part had gone into the hands of innocent purchasers for value and without notice:

*Held,* that a bill filed by the corporation against all of the holders of the over-issue, asking to have the certificates delivered up and canceled, would not lie, and that such complaint was multifarious.

*Held,* further, that in such case the complaint showed on its face that the corporation had no right of action against the innocent purchasers of the false stock, but was itself liable to them for the acts of its transfer agent in issuing it.

*Held,* that as to the parties defendant in such bill when such had purchased at different times from different persons on contracts separate and distinct from each other, there was no common issue or question embracing all of the parties, and in which each was interested, and in which all were concerned. There was no privity of contract or interest between them, and they could not be joined in one action.

Whether the corporation could have a decree against the guilty parties alone for a surrender of the false stock? *Query.*

*It seems,* that a bill may be filed against the whole body of confederates who unite for the commission of an act in violation or fraud of the rights of the plaintiff, however numerous those parties may be. The combination to defraud unites them all together, and presents an issue common to all; and a decree may reach them as a body and each one personally—even though in carrying out the details of that common object each one may have performed acts, and claimed to have acquired rights, personal to himself and independent of his confederates.

Demurrer to a complaint.

This action was brought by the New York and New Haven Railroad Company against three hundred and twenty-four defendants, for the purpose of settling in one suit the numerous claims and questions which arose out of extensive frauds committed by Robert Schuyler, the former president of the corporation, plaintiff. One of the defendants, Cross, demurred to the complaint.

The facts involved, and the substance of the pleadings, appear in the opinion.

*Messrs. Tracy, Dodge, Noyes, Powers* and *Talmadge,* for plaintiffs.

*Messrs. Cutting, Foster* and *Thompson,* for defendant Cross.

Cowles, J.—The defendant, Cross, demurs to the complaint, and on grounds which raise the question whether this suit can be sustained. The facts set forth in the complaint are as follows.

The plaintiff is a corporation, owning and operating a railroad extending from New Haven to New York. The capital authorized by the charter is limited to $3,000,000, represented by 30,000 shares of stock—all of the shares except 78 having been issued, and the capital paid in, less about $700 on the 78 shares, several years since. Transfer books of the stock were kept at the city of New York and two other places, where transfers of the stock were made, and certificates issued as occasion required. From the organization of the company in 1846 to the third of July, 1854, Robert Schuyler was the president and transfer agent of the company, having his station and place of business at the office of the company in New York. As early as October, 1853, he commenced a series of fraudulent acts, extending over the whole period of time intermediate that date and the 3d of July, 1854, during which time unknown to the plaintiff he issued and disposed of large numbers of certificates of stock of the company, which on their face purported to be genuine, were executed and signed in the same manner as genuine certificates, and undistinguishable from them, but which in fact were fraudulent over-issues for his own private purposes. Some of these he issued to a firm

of which he was a member. The others were issued to divers other persons.

In other instances, after making transfers of stock for other parties on the books of the company, he failed to cancel the old certificates which were surrendered for that purpose, but fraudulently re-issued them as genuine certificates of stock owned by himself.

In furtherance of his designs he allowed clerks of his firm to give the firm a false credit on the stock ledger of the railroad company, by which it was made ostensibly to appear that such firm had stock to their credit on the books of the company to $1,000,000, when in truth it owned none.

These false certificates, purporting to be genuine, and these originally genuine certificates, which, instead of being cancel- ed, were re-issued, were used by Robert Schuyler, in his own and in the business of his firm, under representations that they were genuine, chiefly for the purpose of borrowing money : were sold openly in the market as genuine stock in some instances, and have passed in this way into the hands of the defendants, the present holders.

In some instances this over-issued stock has become commin- gled with genuine, by having, in the regular course of busi- ness, been transferred and incorporated into a certificate with the genuine.

The whole false issue amounts to near $2,000,000. Nine thousand three hundred and eighty-three shares now stand on the books of the railroad company, in the names of 29 persons and firms, to whom it had been transferred by the firm to which Schuyler belonged. The balance of such over-issues have gone to the hands of 266 other persons and firms, at dif- ferent times, in different amounts, from different persons, and many of these holders are also the holders of genuine stock.

Intermediate the 29th of June and the 3d of July, 1854, Schuyler, the president and transfer agent of the company, being sick, Mr. Worthen, the vice-president, who was also one of the directors, undertook, but as plaintiff says, without authority, to act as transfer agent in the place of Schuyler, and unaware of Schuyler's frauds, transferred 4446 shares of

that false stock for 21 different persons and firms, supposing the certificates he received and transferred to be genuine.

Some of the holders of this over-issue, as the complaint alleges, took, knowing the certificates were fictitious, some with reason to believe so, some on usurious contracts, many under circumstances which should have put them on inquiry, and many others under circumstances and upon considerations unknown to the plaintiffs.

They all claim rights against the company, some that they are stockholders, others that they are either stockholders or have a right of action against the company for their losses. Some claim damages to the full nominal par value of the certificates they hold—others for the money they have actually advanced, while all assert a claim upon the company in some form.

It is not denied that some of these fraudulently issued certificates have gone into the hands of entirely innocent parties for value.

Several of the defendants have sued the company ; some suits are pending in this court, some in the Superior Court, and others in the Common Pleas of this city. Other suits are threatened. The plaintiff has joined in this suit Robert Schuyler and all the alleged owners or holders of this over-issued stock and prays that the certificates may be decreed illegal and void, and be surrendered up and canceled. That until these questions are all settled those who have sued be stayed in their proceedings, that those who have not, be enjoined from suing, that the suits now pending be consolidated with this, and closes with the usual general prayer for such further or other relief as is meet and proper.

To this complaint this demurrer is interposed.

From the above examination of the complaint, it is seen that the holders of this over-issued stock, (and which, for distinction, I will call spurious stock), have not come in possession of it under a uniform state of facts.

1. There is the firm of R. & G. L. Schuyler, who, or whose assignees, hold by title derived directly from R. Schuyler himself, a member of the firm and the author of the fraud. Whether the firm paid value for it does not appear.

2. There is the class who took from Schuyler with knowledge of the fraud, or have taken under circumstances which it is alleged should have put them on inquiry.

3. A class who hold by title based on usurious contracts with Schuyler.

4. Another still to whom the stock has been hypothecated as security.

5. There is a class who hold certificates originally valid and regularly issued, but which have been surrendered up for cancellation, and then, as plaintiff alleges, stolen by Schuyler and re-issued.

6. There is another class who hold under certificates issued by the Vice President, Worthen.

7. There is another class of innocent holders who have taken without knowledge of any fraud. I assume that such is the fact, because it is not averred in the complaint to the contrary, and among these numerous holders, of the consideration of whose purchase the plaintiff is ignorant, the presumption is they are innocent holders till the contrary is alleged.

8. There is still another class who hold certificates representing in part genuine and in part spurious stock.

Now, upon these facts, assuming them as true, and assuming that this suit shall proceed with the view of determining all questions arising on the facts, it is quite clear that some of these holders are entitled to recover, whatever may be the decree as to others.

With regard to others, it is equally clear the plaintiff would, at the proper time, be entitled to judgment, while with regard to others still, the respective rights of the parties could not be decreed without the solution of difficult and perplexing questions of law, and undoubtedly of intricate questions of both law and fact, since we are not to presume that these parties defendant will suffer judgment to pass by default.

The decree when finally made would necessarily be in the nature of distinct decrees against the several parties separately, and as above observed, as to some, must be against the Railroad Company; in other cases in its favor. Thus, as to those who have taken with full knowledge of the fraud, and the complaint avers that some did, the decree must be against the

holder—a proposition too obviously true to need discussion. As regards the innocent holders, those who have taken for value without knowledge of, or cause to suspect the fraud, the validity of their claim upon the plaintiff for full indemnity in some form, is perfect. True, that proposition only comes up incidentally on this demurrer, and it is but just to say was not made a subject of discussion by the eminent counsel engaged in the argument. Yet, in the view I take of the case, it presents itself as forming one of the elements in the proposition I am seeking to demonstrate, viz. : that upon the facts set forth in the complaint, the decree in this suit, if the bill is sustained, must be against the plaintiff as to some at least of the defendants.

Under that view of the case I am permitted, as regards the innocent holders for value without notice, to say, that well settled, long established principles of law defining the responsibility incurred by principals for the acts of their agents, determines the question of liability for the acts of Schuyler against this corporation, while at the same time fair dealing, an enlightened equity, sound morals and public policy, all concur in requiring there should be no relaxation of the rule. Corporations, capable like natural persons of constituting general agents, doing their business solely through agents and boards of directors, in whom all having transactions with them must more or less confide, should be held to a very strict accountability for the acts of their agents, and the policy and necessity of such rule increases in practical importance just in proportion to the magnitude of the business intrusted to, and performed, by these corporate bodies.

Passing on to the class of persons who hold these certificates under usurious contracts, while I am not called upon to anticipate at this stage of the case what rule of law must be applied there, it is sufficient to say that as to those holders, the decree depends on a solution of questions of both law and fact, (for I cannot assume that the usury will not be denied by answer), which, in their character, are separate and distinct from, and independent of, the questions raised in the other classes of cases.

Again, the rights of parties holding certificates originally valid, then surrendered for cancellation, and afterward surrep-

New York & New Haven R. R. Co. *a.* Schuyler.

titiously issued, requires the solution of still other questions of law, (probably of law and fact,) for the plaintiff claims to treat such certificates as *stolen*, and so not vesting in any other holder, whether innocent or guilty, either right of property or of action.

And so as to all of these holders, the different state of facts under which each has taken, and the different rules to be solved and applied, show that not only must there be separate and distinct adjudications in their nature, independent each of the other, but also that no one class of holders has necessarily any interest in the questions which must control as to every other class.

Each party is entitled to be separately heard, and this requires separate trials for each separate defendant, since between no two of them is there a privity of title or interest.

A further effect, which necessarily follows a joinder of all these defendants, is that while each defendant prefers a claim which is distinct from that of every other, yet no judgment can be given in his favor until a general decree is made as to all.

Thus the one who holds as a *bona fide* purchaser without notice cannot, upon proving the facts which apply to his case, take judgment and enforce his rights without regard to the other defendants, but must remain inactive with no ability to proceed until all the complex, intricate and perplexing questions of law and fact affecting every other party have been tried, the questions passed upon, appeals taken and disposed of, (should either party wish to appeal), reviewed in the Appellate Court, perhaps sent back, then re-tried, re-determined, and perhaps (for who knows to the contrary?) re-appealed, and all this, too, while he has no interest whatsoever in the questions thus litigated between the plaintiff and any other party than himself.

If this suit is to be maintained, such must necessarily be its effect, provided the bill has for its object the end avowed by the plaintiff, viz : a final determination between the plaintiff and each holder of all questions respecting this over-issue of stock. If such *is* the object of the bill, the results I have mentioned, must follow. If it is *not*, the bill should be dismissed.

I have assumed that the several defendants may, by way of counter-claim, set up the demands they assert against the Company. Whether, under the Code, they *can* do so, may be a serious question; but, without deciding, I will assume they can, since that is the view of the case most favorable to the plaintiff. Assuming that, and then tracing, as we have, the nature of the proceedings to follow, provided the demurrer is overruled, with a view of determining the character of the suit, we find it resolves itself into a proposition to try in one suit nearly three hundred separate and distinct causes of action, claimed to be held by as many different parties, having but one feature common to all, viz: that the basis of these several claims is a fraud perpetrated by the plaintiffs' agent. Will such an action lie ?

Plaintiffs aver it can be sustained as a *bill of interpleader ;* but that seems impossible, because the plaintiff in such bill must have no interest in the subject of the litigation.

When that is the case, and the plaintiff has not the means, without hazard to himself, of determining to whom among several and rival claimants the fund in his hands is properly payable, he will be permitted to bring the fund into Court, and compel the rival claimants to interplead each with the other, while the only decree the plaintiff can have, is, that the bill was properly filed.

I can see no feature in this case which in principle brings it within that class of bills, (*Story Eq. Juris.*, § 807, and cases there cited ; *Har. Ch.* 96 ; *Cooper's Eq.* 456 ; Atkinson *v.* Monks, 1 *Cow.* 694, 703). In the case last cited, Mr. Justice Sutherland lays down the following as the distinguishing feature of a bill of interpleader :

1st. That two or more persons have preferred a claim against the plaintiff. 2d. That they claim the same thing. 3d. That the plaintiff cannot, without hazard, determine to whom it belongs ; and 4th. That he has no interest in the thing claimed. Here the plaintiff is directly interested. The suits brought, are to recover directly from this corporation the losses sustained by these several holders, or in some form to make the corporation itself responsible for the acts complained of. Again, these parties do not claim the *same thing* further than they all seek

to make the corporation personally liable for their losses. But this is not, within the meaning of the rule above stated, any more claiming the same fund, or thing, or duty, than would be several different claims by several different parties to recover for as many several and independent wrongs inflicted on each, and for which each would have his separate redress.

It is argued that the plaintiff has really no interest in this controversy, on the ground that the corporation is but a trustee, charged with the protection of the interests of the holders of its stock, and holding its property in trust merely for the several individual corporators, and so disinterested as between the holders of the genuine and alleged fraudulent stock. The argument overlooks the fact that it is the *aggregation of individual corporators*, united under a charter which constitutes that *legal entity, that artificial statutory person, which is created by law, and termed a Corporation.*

In this case the aggregate body of individual corporators united together under this charter, which gives them a common name, a common seal, perpetual succession, and which is known by the name of the New York & New Haven Railroad Company, is what constitutes this Corporation.

The charter merely binds together in interest (so that it can act with unity) this body of constantly changing parties, and, in the very nature of things, there can exist between the Corporation and the individual corporators, by virtue of this corporate organization, no such relation as that of trustee and *cestui que trust.*

A Corporation is a *unity*, but it is the aggregation of the individual corporators under the charter which *makes the unit.* (*Kyd on Corp.*, 13 *Dart.* Call *vs.* Woodman, 4 *Wheat.* 436; Providence Bank *vs.* Billings, 4 *Peters*, 562).

Nor can the bill be sustained as one *in the nature of a bill of interpleader.* In such cases the plaintiff has a certain species of interest in the matter in dispute, but his rights are affected by rival claimants; as in the case of a mortgagor who, wishing to pay up his mortgage and have the lien discharged, finds that several parties claim the moneys which he admits to be due to some one. The Court will allow a bill *in the nature* of a bill of interpleader in such case. And numerous other cases

might be cited in which such bills are proper; but the facts must bring them within the same general principle. (*Story's Eq. Juris.*, 824, and the cases there cited). But there is no analogy between that class of cases and the present. The relief the plaintiff asks consists in the assertion of a positive right, adverse and hostile to the parties defendant. Plaintiff charges that the defendants hold spurious certificates of the stock of the Company, and demands that those certificates be declared void, surrendered up and canceled.

Here at once is a direct conflict between the plaintiff and the defendants. But, how, or in what way are the defendants to interplead? What has any one defendant to demand as against any other defendant, or against the aggregate of the defendants? Should the Court decree them to interplead, what are they to plead? what judgment is the Court to give as between these several defendants? It is quite plain what judgment must be given on the facts pleaded as between plaintiff and some of these defendants; but as between defendant and defendant, it is equally plain there is no judgment to be rendered.

Nor can I discover any principle on which the complaint can be sustained as a *bill of peace*. Such bills are well known and are proper in a variety of instances, and may be filed against a large number of parties. Such as a bill to establish a right to an exclusive, as against many who claim a several, right of fishery. To establish a right to the exclusive enjoyment of a tract of land against all the inhabitants of a particular manor, district, or township, claiming rights of common in the same land. A bill by a patentee to establish or protect his rights against numerous others engaged in infringing those rights, and in numerous other instances, where the main question to be decided, applies equally to all the defendants, or is one in which they are all equally interested or with which they are in some way connected. (*Story Eq. Juris.* § 853 to § 857, 3 *John R.*, 566. Trustees of Town of Huntington *v.* Nicholl, 3 *Johns.* 506; Brinckerhoff *v.* Brown, 6 *John. Ch. R.* 139).

So also bills filed by a party claiming some right or entitled to some relief against all of the defendants, (and they may be very numerous), based upon a confederacy or combination

among those parties for the accomplishment of a general object, to the injury of, or in fraud of the rights of the plaintiff, are of this class. In such cases, to avoid multiplicity of suits, the bill will lie against all the confederates in the fraud, they being engaged in one common object, and that too, although in carrying out the details the several confederates may have performed acts, or claim to have acquired rights, separate and distinct from those claimed by any of the other defendants. If the one common object which was the starting point of the combination is made out, then the separate interests or acts of the several defendants are but emanations from a common source.

Such was the nature of the case in Brinckerhoff *v.* Brown, (6 *Johns. Ch. Rep.* 139), commented on and approved in Fellows *v.* Fellows, (4 *Cow.* 682). There the charge was a combination of all the defendants in one common object—*fraud*—to carry out which general object a series of separate and distinct acts were performed by each defendant, and those acts, independent of and distinct from other acts performed by others, yet all in furtherance and consummation of the general object which formed the confederacy, viz: Fraud.

The plaintiff had a right to be relieved against the effects of this combination, and this brought the case within the rule laid down by that profound jurist, the late Chancellor Kent, who, in Brinckerhoff *v.* Brown, said—a general principle deducible from all the cases is, "that a bill against several parties must relate to matters of the same nature and having a connection with each other, and in which all of the defendants are more or less concerned, though their rights in respect to the general subject of the case may be different." That general principle applies to all cases where there is a multiplicity of parties and the bill is filed to avoid multiplicity of suits. The bill must then have for its foundation some issue which concerns all the parties brought in as defendants—an issue with which each defendant is in some way connected, so as to give the plaintiff a right to some relief as to each one and against all.

The several interests or questions represented in the persons of the several defendants, must, like the several branches of a

tree, have one common trunk from which they all originate. That trunk is the one common object with which the several parties defendant are all connected as offshoots from it. The decree, like the forester's axe, is aimed at that trunk, and the fate of the body becomes the fate of its branches. The idea I would convey is expressed in the figurative language employed by Chancellor Kent in Brinckerhoff v. Brown, where he says:

"The several defendants performed different parts of the same drama—it was still one piece—one entire performance, marked by different scenes."

If I understand the authorities, the above rules are of universal application; and this case, to be sustained, must be fairly brought within those principles. The plaintiff must have rights to assert or relief to demand against all. The first element, the first ingredient in a bill, its very basis, is a right to relief in some form, and that against not a portion merely, but against all the defendants, otherwise they cannot be joined. If the plaintiff is in the wrong, and the right, if any exists, is one which it is for the defendant to assert against the plaintiff, it will hardly be contended that the plaintiff can select his forum—sue the defendant—call him into court, and then ask the court to compel him to prosecute the plaintiff in that forum, or forever hold his peace.

I know of nothing in the history of our jurisprudence which will be claimed as authority for such a step.

Now, keeping the above rules all in view, how stands the case with this railroad company, the plaintiff here? We find that its own agent, held out by it to the world as one in whom implicit confidence might be placed by all dealing with the corporation, or buying its stock—we find that this man, the president of the company, violates the confidence reposed in him by the plaintiff. But in what way? Has he taken the funds, or property, or assets of the company, and then, confederating with the defendants, undertaken to distribute or share them with the defendants, in fraud of the company? No; he has not touched a dollar of those funds, or any part of the company's assets. He has only issued certificates which purport to be evidence that the party to whom they were issued was a stockholder to the extent named in the certificate, when

the fact was not so. The certificates are false. They say what is not true; but, holding the position given him by the plaintiff, and known as the president of the company, he is enabled to sell them, or procure them to be sold. They are sold openly in the market, and in part, at least, to innocent purchasers, who suppose, and have every reason to suppose them genuine. They part with their money for these certificates—are victimized, and then Schuyler runs away. Now, take just what the plaintiff says about all this, viz.: that a part of these purchasers are guilty confederates with Schuyler, or at least that they bought with full knowledge of their false character. If that is so, then under no circumstances as to those holders can the company sustain any loss, for the certificates are as valueless to the guilty holder as an equal amount of counterfeit bank notes. If they sue, the company has only to defend and 'defeat them. But there are others who confessedly are *innocent purchasers* of these false certificates—for value and without notice—and they are made parties here. Now against those parties what rights have this corporation? What claim has the company on them? What claim can it have? What, in the shape of a decree, will this railroad company ask this court to make in its favor, and against these innocent victims? To give'up these false certificates, fraudulently imposed upon them by the plaintiff's own agent, in whom this company had assured them they could repose unlimited confidence? What right has this corporation acquired as against these innocent holders, that they should have such a surrender made, or will the corporation ask that these parties be compelled to sue the corporation? That, as it seems to me, is clearly the *effect* of sustaining this bill against these innocent holders, viz: to enable the plaintiff to select the forum and compel these parties to sue there, or not at all—that is, if by a joinder it is intended in this action, as is avowed, *to have all questions arising out of these frauds adjudicated*—for I have already held that these innocent purchasers have a perfect right to full indemnity against the company for the acts of Schuyler. But they would thus not only be compelled to litigate in a forum selected by their adversary—by an adversary, too, who had no possible right of action against them

—but to do it in the same action with numerous other defendants, between whom and themselves there is not the most remote connection. I know of no rule which can render such a bill proper.

As to the guilty holders, I have already said they have no rights against the Company, and that if they sue, the Company has but to defend to defeat them.

But the bill seems to be based upon the idea that there is a species of value or property in these certificates which entitles the Company to have them surrendered. This might possibly be the case as to all confederates of Schuyler in the fraud, who hold these certificates and are asserting some claim upon the Company, under them—but even that is doubtful—for as to the guilty holders, the certificates are worth no more than the forged notes of the Company. But would a bill be sustained to compel a surrender up of forged notes, filed by the person whose name purported to be signed to the notes? It seems to me not. If, instead of issuing $2,000,000 of false certificates, this Company had held securities to the same amount—say bonds of some other company—guaranteed by the plaintiffs, and Schuyler had confederated with these defendants to sell and distribute the securities among the defendants in fraud of the plaintiff, and had consummated this fraud, then on principle, this Company could have filed a bill against all the parties, and asked to have the securities surrendered, and each defendant enjoined from suing on the guaranty—if such suits had been commenced or threatened.

But suppose the plaintiff holding just such securities, had authorized Schuyler to sell them, and he had sold a part to innocent purchasers for value, and had combined with certain others to dispose of the residue in fraud of the Company, and had not only done so, but had appropriated the purchase money paid by the innocent purchasers, to his own purposes, would a bill filed against him and his confederates in the fraud, lie against the innocent holders too, to procure a surrender of their stock? That will not be claimed.

Now I do not assert that the case at bar is parallel in all respects with the case I have supposed; but as it seems to me, it is sufficiently so to be governed by the same general princi-

ple. As between these innocent holders, and Schuyler and the guilty holders, I can see no " matters of the same nature, and having a connection with each other, and in which all the defendants are more or less connected" within the meaning of the rule laid down in Brinckerhoff *v.* Brown. Had they all been guilty of the fraud, or directly or indirectly conspired with Schuyler, there would have been a common question as to all.

The joint intent to defraud, would have formed the body, and the acts and interests of the several defendants the branches, and then that part of the case would have been made out for a bill, and a proper bill too, if the other facts warranted.

But no such common question, nor any question as far as I can perceive, arises, or is made out, which connects the several parties, or entitles the plaintiff, admitting all his facts—to a decree against any parties, certainly against none who are innocent purchasers; and the guilty ones, except Schuyler, are not pointed out in the complaint, and so I must presume Cross an innocent one.

The mere fact that all of these parties happen to hold the false certificates, does not bring them within the rule laid down by Chancellor Kent.

But there seems to be a further general rule (although the rule to which allusion has already been made, has its exceptions,) that a Bill of Peace will not be sustained to enjoin numerous defendants from bringing separate suits until the plaintiff has first established his rights by trial in a court of law as to some one of them. West *vs.* The Mayor of New York, (10 *Paige*, 539). The case of a patentee after succeeding on a trial at law, is a familiar illustration of the rule that it may lie afterwards. On the whole I can discover no principle which applied to this case will sustain the complaint. The difficulties are irremediable, such as are incident to and inherent in the nature of the case itself. Convenience will not sanction it—for should an attempt be made to proceed with the suit, no ingenuity or perseverance of counsel—no aid which the court could furnish, can relieve the case from these perplexities, embarrassments and delays which must necessarily

attend every attempt to urge it forward ; while on the other hand, the chance of frequent deaths and other accidents incident to the case, with the necessity of numerous revivors, would enable any party, should interest so prompt, to make the litigation almost interminable. I regret the conclusion to which I am forced. I had hoped to discover there was a mode by which in a single suit embracing all parties, those questions affecting interests of such magnitude and parties so numerous, might be speedily solved—and the rights of all determined. We find here a loss, through the faithlessness of one man, amounting to near $2,000,000, all or nearly all of which must fall upon innocent parties—whether such loss is sustained by the holders of the genuine or spurious certificates, or in part by each. Such a loss is a deplorable public calamity. Could the aggravation of these evils caused by numerous and protracted suits, brought to settle the questions arising out of this fraud, be avoided, and a speedy determination arrived at in one action, the court would gladly, if it had the power, entertain jurisdiction and terminate the controversy. But increased reflection has but confirmed my convictions that the difficulties of pursuing such a course cannot be overcome. For such obstacles the eminent pleader who drew this bill, is not responsible. They have their origin in the nature of the case itself, rendering a joinder of all these defendants in one bill, under the circumstances, an impracticable mode of determining the rights of the parties.

The complaint is multifarious.

The demurrer must be sustained, and judgment ordered accordingly with costs, and the injunction as to the demurrent dissolved.